**WHIPPLE AZZARELLO, LLC**
Attorneys at Law
———
161 Madison Avenue, Suite 325
Morristown, New Jersey 07960
Tel: (973) 267-7300
Fax: (973) 267-0031
**whippleazzarellolaw.com**

**JOHN C. WHIPPLE**
Certified by the Supreme Court of
New Jersey as a Criminal Trial Attorney

**JOHN A. AZZARELLO**
Admitted in New Jersey
and New York

**AMY VALENTINE McCLELLAND**
Of Counsel

**ADAM M. ELEWA**
Admitted in New Jersey
and New York

March 21, 2023

U. S. Magistrate Judge Michael A. Hammer
United States District Court
U.S. Courthouse
50 Walnut Street
Newark, NJ 07102

    Re:    **United States v. Peter Coker, Jr.**
                  **Docket No. 22-CR-643 (MAH)**

Dear Judge Hammer:

       Our Office represents Mr. Peter Coker, Jr. in the above-captioned matter. Mr. Coker moves pursuant to 18 U.S.C. § 3142 to be released from pretrial detention on conditions that will "reasonably assure" his appearance in Court and the safety of the community. In sum, Mr. Coker—who does not face a rebuttable presumption of detention given the charges and facts of this case—should be released to his parents' home in North Carolina on conditions of strict home confinement, GPS location monitoring, and on a 1.5 million bond secured by over 1.5 million in equity in five (5) properties located in North Carolina. We submit these conditions will more than adequately secure Mr. Coker's appearance in Court in a case where Mr. Coker *does not* likely face a term of incarceration, and where the government has not identified a single victim who has suffered financial loss.

### Procedural History and Criminal Allegations Against Mr. Coker

       The government unsealed its indictment against Mr. Coker on September 22, 2022, alleging Mr. Coker's involvement in a fraudulent scheme that spanned from 2014 until 2022. *See* ECF No. 1 at 1-24: *Indictment*. The government's indictment charges Mr. Coker with three counts, specifically one count of Conspiracy to Commit Securities Fraud, 18 USC 371, one count of Securities Fraud, and one count of Conspiracy to Manipulate Securities Prices. *See* ECF No. 1 at 1-24. The factual allegations underlying all three counts, in sum and substance, describe a series of financial transactions engaged in by Mr. Coker and those connected to Mr. Coker designed to artificially inflate the share price of two companies, Hometown International ("Hometown") and E-Waste, both of which were ultimately controlled by Mr. Coker and his co-conspirators. *Id*. During the timeframe alleged in the government's indictment, both Hometown and E-Waste were traded on the OTC Link Alternative Trading System ("OTC Market").

The government has not alleged that anyone other than Mr. Coker, or those knowingly involved in the scheme, invested money in either Hometown or E-Waste. Accordingly, although the government's indictment alleges market manipulation designed to artificially inflate the price of two publicly traded securities (colloquially known as "pumping" the value of a security) it does not allege that the manipulated securities were ever sold to those not involved in the conspiracy (colloquially known as "dumping" the security on unsuspecting investors). *See id*. pg. 15 ¶¶ 4(q) and 4(w) (acknowledging that neither Mr. Coker nor any of the other members of the conspiracy sold the manipulated Hometown or E-Waste shares to the public for a profit). The government's indictment, therefore, alleges only an *attempted* fraud that did not result in actual financial loss to any identifiable victim. The absence of any actual loss is an important factor to note because it means Mr. Coker's exposure under the sentencing guidelines is dramatically reduced to the point where he would face minimal or no jail time if convicted given the Third Circuit Court of Appeals' recent decision in *U.S. v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022). This point is further illustrated below where we set forth a detailed sentencing guidelines analysis.

Mr. Coker has lived and worked outside of the United States for his entire adult life. Upon graduating from Lehigh University in 1990 Mr. Coker – who is fluent in Chinese - was recruited by a US financial services company called Bridge Trading to expand its business in China and Hong Kong. Mr. Coker moved to Hong Kong to pursue this opportunity with Bridge Trading and set about building his professional and personal life in Asia. Some years later, having permanently relocated to Asia, he applied for and was granted permanent resident status in Hong Kong and Macau. In 2019, primarily for economic reasons and in recognition that his personal and professional life was outside of the United States, he took the further step of relinquishing his US citizenship to become a citizen of St. Kitts and Nevis. He took these steps well before the government unsealed its indictment.

When he first learned of the government's indictment Mr. Coker was living in a well-known ex pat community in Phuket, Thailand. In the weeks prior to his arrest he was being treated by doctors for a liver condition. He remained living openly in Phuket receiving medical attention until his arrest by Thai authorities on or about January 11, 2023. Upon his arrest Mr. Coker immediately waived his extradition rights so that he could face the charges against him. The Thai authorities detained Mr. Coker in a Bangkok prison for the ensuing 62 days pursuant to their local practices in extradition cases. On or about March 12, 2023 Mr. Coker was transported back to the US. He was arraigned in the District of New Jersey on March 15, 2023. ECF No. 34.

Mr. Coker's appearance in the United States would have likely occurred sooner if not for serious health issues he faced in the period following the unsealing of the indictment against him. Notably, Mr. Coker discovered that he was suffering from cirrhosis of his liver and hypoxemia (low levels of oxygen in his blood) which made travel by airplane unadvisable and extremely risky. Accordingly, Mr. Coker prioritized seeking medical treatment in his local community of Thailand rather than immediately surrendering to authorities and risking the possibility that he would be transported by plane to the United States against his doctor's advice. In fact the Thai authorities opted to drive him from Phuket to Bangkok after his arrest (a 12 hour trip by car) apparently out of concern that he was too unwell for the two hour flight. In addition, given his permanent residence status in Hong Kong and the proximity of Thailand to China, Mr. Coker

presumably had opportunities to flee to jurisdictions without extradition treaties with the United States. He chose instead to attend to his health condition and prepare to face the charges in the United States.

## Legal Argument

It is very important to note at the outset that, pursuant to 18 U.S.C. § 3142, Mr. Coker is not subject to the rebuttable presumption that there are "no condition or combination of conditions will reasonably assure his appearance in court and the safety of the community. Specifically, Mr. Coker is not charged with any of the offenses enumerated under § 3142 (e)(3)(A – E). For example, the indictment does not allege any controlled substance offenses that would expose Mr. Coker to ten or more years of imprisonment. *See* § 3142 (e)(3)(A). Simply stated, this is not a rebuttable presumption case. Rather, the government has the burden of demonstrating that there is a "**serious risk**" that Mr. Coker will flee, or "obstruct or attempt to obstruct justice," or intimidate or attempt to intimidate prospective witnesses or jurors and "that no condition or combination of conditions will **reasonably assure**" that Mr. Coker abides by the conditions of his release. *See* § 3142 (f)(2) (emphasis added).

> I. *Detaining Mr. Coker Prior To Trial Would Result In A Deprivation Of His Right to Due Process As The Duration Of His Pretrial Detention Would Likely Exceed Any Potential Term of Incarceration*

The government has alleged Mr. Coker's involvement in a complex financial fraud involving dozens of alleged participants. We understand from discussions with AUSA Shawn Barnes the government has already provided counsel for the codefendants in the case with several terabytes of discovery, consisting in part of hundreds of thousands of pages of financial documents and records. Accordingly, given the factual and legal complexity of the case against Mr. Coker, it is very unlikely the government and defense counsel will be prepared to proceed to a trial in this matter for 18 to 24 months. Moreover, even assuming arguendo this case could be resolved without a trial and through plea negotiations, it would still take several months for defense counsel to review the voluminous discovery and conduct an independent investigation of the allegations in the indictment before engaging in any meaningful discussions with the government. In any event, the duration necessary to resolve this case poses a very real and serious risk that Mr. Coker's pretrial detention will infringe upon his right to due process as that detention will likely exceed his exposure to incarceration under the applicable advisory sentencing guidelines—whether Mr. Coker decides to proceed to trial or not.

Based on the charges contained in the government's indictment, the total offense level that would arguably apply to Mr. Coker under the sentencing guidelines would be level 11. Specifically, the base offense level applicable to Mr. Coker would be seven pursuant to USSG §2B1.1(a)(1). Assuming arguendo a two-level upward adjustment is warranted for "sophisticated means" under §2B1.1(b)(10), and assuming a four-level upward adjustment is also warranted under §2B1.1(b)(20)(A) based on allegations in the indictment that Mr. Coker was a director of Homeland, a once publicly traded company, during the conspiracy, then that would yield an adjusted offense level of 13. Assuming the parties resolved this matter through plea negotiations, Mr. Coker would be entitled to receive a two-level reduction for acceptance of responsibility,

hereby resulting in a total offense level of 11. Since Mr. Coker has no prior convictions and zero criminal history points, he falls within criminal history category I. With a total offense level of 11 and criminal history category I, Mr. Coker would be exposed to 8-14 months in prison under Zone B of the sentencing guidelines. However, as the Court is aware, when the applicable guideline range is in Zone B of the Sentencing Table, the Court is authorized to impose a sentence of probation provided the minimum term is satisfied by home detention. USSG §§5B1.1(a)(2) and 5C1.1(c)(3). Therefore, Mr. Coker could be sentenced to a term of probation conditioned on 8 months' home confinement under this analysis.

Alternatively, if Mr. Coker elected to proceed to trial and was convicted, he would arguably not receive a two-level reduction for acceptance of responsibility[1], thereby subjecting him to a total offense level 13. With a total offense level of 13 and criminal history category I, Mr. Coker would be exposed to 12-18 months in prison under Zone C of the sentencing guidelines. However, as the Court is also aware, when the applicable guideline range is in Zone C of the Sentencing Table, the Court is authorized to impose a split sentence requiring a defendant to serve half the time in prison and the other half on home confinement. Therefore, even if convicted at trial, Mr. Coker could face as little as 6 months in prison and 6 months on home detention followed by a period of supervised release. USSG §5C1.1(d)(2).

It is worth emphasizing the relatively low total offense level in this case is primarily driven by (a) the fact that Mr. Coker's alleged scheme did not result in any actual financial loss to an identifiable victim and (b) a recent Third Circuit decision (*published after the government filed its indictment against Mr. Coker*) precluding from consideration under the Sentencing Guidelines "intended" or attempted loss. *See U.S. v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022) (loss under USSG §2B1.1 only refers to the "loss the victim actually suffered").[2] *U.S. v. Banks* represents a marked change from how sentencing courts previously calculated the total offense level in fraud cases, resulting in *significantly less* exposure to incarceration for a defendant like Peter Coker who finds himself in the unusual position of defending criminal charges in a case where no one suffered financial harm as a result of his conduct.

Therefore, in light of the Third Circuit's decision in *Banks*, detaining Mr. Coker pretrial, whether this case proceeds to trial or is resolved through plea negotiations, would likely result in Mr. Coker serving a significantly longer term of incarceration awaiting trial than he would face at sentencing if he was convicted following trial. Specifically, under the advisory guidelines analysis set forth above, Mr. Coker could enter a guilty plea and be sentenced to a term of probation conditioned on home confinement after serving 18 to 24 months in pretrial detention in addition to the 63 days he spent in prison in Bangkok in absolutely inhumane conditions while he awaited transportation from Bangkok to the United States after he waived his extradition rights.

Alternatively, even if Mr. Coker is found guilty following trial, with a total offense level of 13 and Criminal History Category I, he could receive a split sentence of 6 months in prison

---

[1] Even if he was convicted at trial, nothing prevents Mr. Coker from accepting responsibility for his conduct after the jury verdict and before sentencing. If this were to occur, there is legal authority to support the proposition that Mr. Coker would still be entitled to a two-level reduction for acceptance of responsibility under USSG §3E1.1(a).

[2] Given the holding of *U.S. v. Banks*, 55 F.4th 246 (3d Cir. 2022), the government is also precluded from using economic "gain" to Mr. Coker to calculate his total offense level under the loss table contained in USSG §2B1.1.

and 6 months on home confinement under Zone C. *See* USSG §5C1.1(d)(2). Accordingly, we submit detaining Mr. Coker prior to trial in this case—a complex financial and securities fraud case that may take 18 to 24 months for defense counsel to adequately investigate and litigate— would represent a significant infringement of Mr. Coker's due process rights as he would have served over half a year longer than the maximum advisory sentence before having the opportunity to hold the government to their burden of proof at trial. *See e.g. U.S. v. Briggs*, 697 F.3d 98, 103 (2d Cir. 2012) (prolonged pretrial detention can potentially violate a defendant's due process rights); *see also U.S. v. Lofranco*, 620 F. Supp. 1324, 1325 (N.D.N.Y. 1985) ("holding a defendant without bail for longer than he would serve if tried and convicted must also violate due process.").

In sum, we submit it would be fundamentally unfair and arguably a violation of Mr. Coker's constitutional right to due process if he was ordered detained at the Essex County Correctional Facility and held there for a lengthy period that substantially exceeded his exposure at sentencing. In this regard, depriving Mr. Coker of his liberty for even one day beyond the total loss of freedom he would suffer following a conviction is antithetical to the foundation and principles of our criminal justice system including the sacred tenet that every person is presumed innocent until proven guilty and undermines the rights guaranteed Mr. Coker under the United States Constitution.

### II. *There Clearly Are Conditions of Release That Will Reasonably Assure That Mr. Coker Returns to Court And That Others Will Remain Safe*

Mr. Coker is fortunate to have the support of family in the United States who are willing and able to open their home to him, pledge significant tangible assets on Mr. Coker's behalf, and serve as his third-party custodian. Accordingly, the following conditions of release can be satisfied by Mr. Coker should he be released from pre-trial detention:

- Home confinement to his parents' home in Chapel Hill, North Carolina.
- Mr. Coker's mother, Susan Coker, would serve as Mr. Coker's third-party custodian.
- Mr. Coker's parents would post their home in North Carolina as collateral for a secured bond. The home has approximately $827,769 in equity.
- Mr. Coker's sister, Dina Coker, would post her own home as well as three investment properties she owns located in North Carolina as collateral for a secured bond. The total equity underlying the four properties is approximately $828,609.
- GPS location monitoring, travel restrictions, and the surrender of all travel documents.

In sum, Mr. Coker would be confined to his parents' home in North Carolina, with his own mother serving has his third-party custodian, and should Mr. Coker flee, both his parents and his sister would forfeit five properties valued at approximately $1,656,378—a sum well in excess of any gain or loss incurred by anyone as a result of the scheme alleged in the indictment pending before the Court.

The economic value of the five properties, however, does not fully capture what Mr. Coker's family is willing to pledge to secure his return to Court because at least one of the five

properties holds immense sentimental value for Peter's parents, Susan and Peter Coker, Sr. Specifically, the Chapel Hill property offered as collateral by Mr. Coker's mother and father was designed and built from scratch on an empty lot—his parents dream home representing a lifetime of hard work and sacrifice. Both parents are now 80 years old. Similarly, Mr. Coker's sister has agreed to post her home where she lives with her family, as well as three investment properties she worked hard to obtain and from which she derives a sizable portion of her yearly income. Given the proposed conditions, it is beyond extremely unlikely that Mr. Coker would abscond and thereby not only financially destroy his entire nuclear family and leave them homeless, but also emotionally bankrupt those he loves most by taking from them properties of immense sentimental value. Accordingly, we submit the proposed conditions will undoubtedly "reasonably assure" that Mr. Coker abides by the conditions of his release pending trial. 18 U.S.C. § 3142 (f)(2).

### III.   Mr. Coker Is Not A Fugitive, And Could Have Mounted A Defense From Abroad

It should also be noted that Mr. Coker is not a "fugitive" from this jurisdiction as his residence in Hong Kong and Thailand was not undertaken to "distance [him]self from the United States or frustrate arrest" nor is his "presence abroad . . . []related to the American prosecution." *U.S. v. Bescond*, 7 F.4th 127, 141 (2d Cir. 2021). The simple fact remains Mr. Coker did not flee the United States after learning of the charges in the indictment. Rather, he awoke one day in Thailand after living in Hong Kong and Thailand for over 30 years and learned for the first time he was indicted in the United States. Therefore, it may have been possible for him to mount certain legal challenges to his criminal prosecution through defense counsel without first having to set foot in the United States. *See id*. at 132. It is worth noting, however, Mr. Coker did not pursue this course of action. Instead, Peter Coker chose to waive his extradition rights and agreed to return to this Court's jurisdiction and face the charges against him.

### Conclusion

Mr. Coker has proposed conditions of release that will more than reasonably assure his appearance at all future court proceedings. Moreover, should Mr. Coker be denied release, we submit his detention will violate his right to due process as it will be nearly impossible for him to hold the government to their burden of proof without having first served a term of incarceration greater than what he will likely face if convicted on all counts of the indictment in this case.

Respectfully submitted,

**WHIPPLE AZZARELLO, LLC**

By:   s/ John A. Azzarello
John A. Azzarello
Adam M. Elewa

Cc: Shawn P. Barnes, AUSA (by ECF)