**WHIPPLE AZZARELLO, LLC**
Attorneys at Law
―――――
161 Madison Avenue, Suite 325
Morristown, New Jersey 07960
Tel: (973) 267-7300
Fax: (973) 267-0031
**whippleazzarellolaw.com**

**JOHN C. WHIPPLE**
Certified by the Supreme Court of
New Jersey as a Criminal Trial Attorney

**JOHN A. AZZARELLO**
Admitted in New Jersey
and New York

**AMY VALENTINE McCLELLAND**
Of Counsel

**ADAM M. ELEWA**
Admitted in New Jersey
and New York

March 27, 2023

**VIA ECF**

U. S. Magistrate Judge Cathy L. Waldor
United States District Court
U.S. Courthouse
50 Walnut Street
Newark, NJ 07102

      Re:      **United States v. Peter Coker, Jr.**
                  **Docket No. 22-CR-643 (CPO)**

Dear Judge Waldor:

      Our Office represents Mr. Peter Coker, Jr. in the above-captioned matter. Mr. Coker writes in reply to the Government's response dated March 22, 2023, opposing Mr. Coker's application for pretrial release.[1]

      We note at the outset that the charges filed against Mr. Coker in this case **do not give rise to the rebuttable presumption** that no condition or combination of conditions will reasonably assure Mr. Coker's appearance at future court proceedings. Indeed, it is the government's burden to establish Mr. Coker is a serious risk of flight. In sum, the government's response presents no "evidence" that Mr. Coker is a "serious risk" of flight or that there are no conditions that would "reasonably assure" his return to Court. *See* 18 U.S.C. 3142(f)(2). Rather, the government attempts to meet its burden with little more than insinuation and speculation about Mr. Coker's motives and his status as a non-U.S. Citizen. The government's speculative theories about Mr. Coker make little logical sense once scrutinized, and largely conflict with the actual evidence in this case. The government's response also misstates the law concerning Mr. Coker's status as a "fugitive" as well as Mr. Coker's exposure if convicted under the applicable sentencing guidelines in this case.

      We submit that a clear analysis of the government's indictment, the applicable sentencing guidelines' range, and the facts regarding Mr. Coker's time abroad do not reveal any evidence that Mr. Coker intends to flee the United States or that his substantial bail package is inadequate to mitigate whatever minimal risk of flight may exist. Simply stated, the government has failed to show that there are no conditions that will reasonably assure Mr. Coker return to court.

---

[1] The government's opposition brief is hereinafter referred to as "Gov't Opp." and Mr. Coker's initial application for pretrial release is hereinafter referred to as "Def. Br."

**Legal Argument**

    I.    *The Government Confuses Mr. Coker's Desire to Live Abroad—Which Well Predates the Government's Indictment—As Evidence of His Desire to Flee the United States*

    In its effort to establish that Mr. Coker presents a "serious" risk of flight, the government relies heavily on the fact that Mr. Coker is not a U.S. Citizen and has renounced his U.S. Citizenship prior to the government's indictment. Neither of these facts—regardless of how many times the government repeats them in their submission to this Court—evidence Mr. Coker's desire to flee or likelihood of flight. Rather, these facts evidence Mr. Coker's desire to live outside of the United States, a desire that predates both the government's indictment and the alleged fraud before this Court, not a desire to *flee* the criminal prosecution against him. This fundamental distinction eludes the government, leading them to distort key facts, present illogical theories about Mr. Coker's behaviors, and misstate the applicable law in this case.

    First, as the government acknowledges, Mr. Coker "never utilized an alias to mask his personal identity," and in fact lived openly in a well-known ex patriot community in Phuket, Thailand where he was being treated by doctors for a liver condition. Gov't Opp. at 9; *see also* Def. Br. at 2. Mr. Coker was not difficult for the U.S. government to locate, never took steps that would make him difficult to locate and was ultimately quickly located and arrested at the direction of U.S. authorities. Once arrested, Mr. Coker immediately waived extradition—giving up any right he may have had to remain abroad. Simply put, these are not the actions of someone wishing to evade capture and extradition to the United States, or who now presents a serious risk of flight.

    Second, the government attempts to recast inquiries Mr. Coker made while abroad about the nature of the pending U.S. warrants against him—i.e., a foreign citizen's attempts to gather information about the U.S. government's prosecution of him—as indicative of more sinister motives. Specifically, the government insinuates that these inquiries suggest that Mr. Coker was making plans to flee to a country with no extradition treaty with the United States yet decided against it due to fear of arrest at the border. Gov't Opp. at 10. The fact remains, however, that Mr. Coker made no attempt to flee Thailand. He stayed right where he was and sought necessary medical treatment under his own name. Def. Br. at 2-3. And once arrested, Mr. Coker made no efforts whatsoever to contest the United States's jurisdiction over him. The government's speculative theory about Mr. Coker's motives also makes little sense. If Mr. Coker's arrest and extradition from Thailand to the U.S. was certain due to the extradition treaty between the countries and he wanted to avoid prosecution, then why didn't Mr. Coker attempt to cross the border into Hong Kong? A failed attempt to cross the border would have led to Mr. Coker's arrest and extradition at the border rather than arrest and extradition from Thailand.

    Third, the government's arguments regarding Mr. Coker's connections abroad are ultimately self-defeating. Specifically, the government argues that Mr. Coker's "foreign ties are among the most significant factors" warranting his detention, including Mr. Coker's "extensive ties to executives with access to large amounts of money outside the United States." Gov't Opp. at 9. The government also contends that Mr. Coker has "all the means necessary to evade this

prosecution and live a very comfortable life abroad." *Id*. at 13. And yet, despite all of Mr. Coker's alleged foreign ties, financial and otherwise, Mr. Coker never attempted to flee Thailand, purchase false identities, pay someone to smuggle him across the border from Thailand to Hong Kong or to another country without an extradition treaty, or engage in any other method of escape and evasion purportedly available to him.

Lastly, the government attempts to bolster its argument by drawing a false equivalency between fugitive defendants who flee the United States to avoid prosecution and non-U.S. citizens the government seeks to extradite to the United States to face charges. This false equivalency is evidenced most readily by the government's misreading of Third Circuit case law regarding the "fugitive disentitlement doctrine." *See* Gov. Br. 10. Specifically, the government argues that because Mr. Coker "failed to surrender" to U.S. authorities that he was a fugitive, and thus could not have mounted any legal challenges to his criminal prosecution from abroad. *Id*. The cases cited by the government, however, concern defendants who were charged, brought before the court, convicted, fled the jurisdiction, and then attempted to avail themselves of the U.S. legal system. See *id*. citing *Molinaro v. New Jersey*, 396 U.S. 365 (1970) (fled after conviction and before appeal); *U.S. v. Donahue*, 2011 U.S. Dist. LEXIS 167125, at *8 (M.D. Pa. Jan. 14, 2011) (fled after conviction and before sentencing). In contrast, Mr. Coker's decision to reside abroad was not done to "frustrate arrest" and did not in any way relate to the government's prosecution. *See* Def. Br. at 6 *citing U.S. v. Bescond*, 7 F.4th 127, 141 (2d Cir. 2021) (making distinction between fugitives and foreign citizens prosecuted by the U.S. government under fugitive disentitlement doctrine). The fact that Mr. Coker never attempted to flee the U.S. or take steps to frustrate his arrest means that he was not a fugitive at any point.

Mr. Coker does not dispute that he has foreign ties. He is a non-U.S. Citizen and has lived abroad for most of his adult life. Mr. Coker's foreign ties, however, do not evidence any desire, plan, or likelihood of flight or present such a "serious risk" of flight that no condition or combination of conditions of release can reasonably assure his appearance at future court proceedings.  Mr. Coker has also demonstrated, by waving his extradition rights and declining to contest the legal validity of the charges against him, that he expressly does not wish to avail himself of his foreign ties to avoid criminal prosecution in the United States. Given these facts, the government has failed to establish that Mr. Coker presents such as serious risk of flight that no conditions of release will reasonably assure his return to court.

> II. <u>The Government Tacitly Concedes That No Victim Has Suffered Any Economic Loss—And Improperly Relies Upon Economic Gain to Calculate the Applicable Guidelines' Offense Level</u>

The primary point of contention between Mr. Coker and the government regarding the applicable sentencing guidelines range is whether Mr. Coker's sentence can be enhanced pursuant to the "loss" table contained in USSG §2B1.1. Mr. Coker contends that, based on the government's indictment and prevailing Third Circuit case law, there was no actual loss to any identifiable victim in this case, and thus Mr. Coker's sentence cannot be enhanced pursuant to the USSG §2B1.1 loss table. *See* Def. Br. at 2; 3-5. The government, on the other hand, contends that "the over $800,000 in consulting fees that he and his co-conspirators were paid by Hometown for no-show jobs" is a cognizable "loss" under USSG §2B1.1. Gov't Opp. at 8-9. The

3

government's argument relies on several obfuscations and elisions about the facts of this case and the law.

The government's indictment does not identify a single victim that has lost any money due to Mr. Coker's alleged conduct. The government's indictment, in sum, describes an *attempted* fraud, rather than a completed fraud. Def. Br. 1-2. Moreover, the government's indictment describes the money deposited in the two companies used to facilitate the attempted fraud, Hometown International ("Hometown") and E-Waste, as originating with either Mr. Coker, Mr. Coker's co-defendants, or those connected to Mr. Coker and his co-defendants who were aware of the fraud and were seeking to profit from the fraud once either company was acquired by an unexpecting investor. *See id*; *see also* Gov't Opp. at 1-6. Any money taken out of either company, therefore, cannot be categorized as loss to any victim *as that money originated with the participants in the fraud.* The government tacitly admits this fact by not including in its loss amount any sum invested in either company, including most conspicuously a sum of 2.5 million dollars that was purportedly invested in Hometown by "three accredited investors." Gov't Opp. at 5. This 2.5-million-dollar sum is also nowhere categorized as financial loss to a victim in the government's indictment.

If the consulting fees cannot be considered loss—as that money was never taken from a victim—those fees can at best be categorized as *gain* to Mr. Coker and his co-defendants. Gain, however, is not cognizable under the loss table contained in USSG §2B1.1 for two reasons. First, and most simply, the sentencing guidelines permit gain to be used as a substitute for loss "*only if there is a loss* but it reasonably cannot be determined." USSG §2B1.1 Application Note 3.B (emphasis added). In this case, there was no loss, so gain cannot substitute for loss. Second, the Third Circuit has held that where the sentencing guidelines' commentary "expands the definition of loss" beyond its plain meaning the Court should "accord the commentary no weight." *U.S. v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022). Interpreting loss to also include its antonym, gain, is certainly an expansion of the definition of loss and thus should be disregarded in calculating loss under USSG §2B1.1.

Absent any loss to an identifiable victim, detaining Mr. Coker prior to trial would likely infringe upon his right to due process under the United States Constitution as doing so would likely impose on him a much longer term of incarceration than he would face upon conviction, either after a trial or a plea of guilty. *See* Def. Br. at 3-5. Specifically, as stated by Mr. Coker in his initial brief, if he pled guilty to the charges in the indictment, he would face a probationary sentence while he would face a split sentence of 12 to 18 months under Zone C if convicted at trial.

### III. <u>The Bail Package is Sufficient to Negate Whatever Risk of Flight May Exist</u>

In disputing the sufficiency of the proposed bail package, the government focuses on the fact that the 1.5 million dollars of collateral is being provided by his father and sister. Gov't Opp. at 11-12. The government does not address the sufficiency of any other proposed conditions of release, including the condition of home confinement in the North Carolina, Mr. Coker's mother serving as his third-party custodian, GPS location monitoring, travel restrictions, or the surrender of all travel documents. Def. Br. at 5. With respect to the 1.5 million dollars of collateral, the

government suggests that this sum is "drop in the bucket for this defendant" because he "stood to make tens of millions of dollars from the [fraud]" and could theoretically earn more money via his "financial prowess." Gov't Opp. at 12-13.  The government also believes that Mr. Coker allegedly involving his father in the fraud and using his sister's trading account means that he would be willing to flee and forfeit this 1.5-million-dollar sum provided by his family. *Id* at 12. On the contrary, knowing that his failure to appear at future court proceedings would leave his parents and only sibling homeless, as well as financially and emotionally bankrupt creates the greatest incentive for Mr. Coker not to abscond. Simply stated, the government's arguments miss the mark and are largely irrelevant with respect to the central question before this Court: whether the proposed conditions of release will reasonably assure Mr. Coker's return to court.

First, the fact that Mr. Coker *could* have made more money from the fraud is wholly irrelevant. Mr. Coker didn't earn any money from the fraud and, given the highly publicized nature of the charges against him, it is almost certain that Mr. Coker will not be able to use his "financial prowess" to earn a sum close to the amount being pledge anytime soon.[2] The amount being pledge is thus not a "drop in the bucket" for either Mr. Coker or his family, despite the government's glib estimation of their future earning potential.

Second, the fact that Mr. Coker's family is willing to pledge much of their net worth to secure Mr. Coker's return (including properties that hold immense sentimental value) speaks volumes about their estimation of Mr. Coker's character and willingness to return to Court. Mr. Coker's father and sister are not naïve or blind to the government's allegations in this case. Accordingly, the government's contention that they know Mr. Coker better than his own family and that he would be willing to jeopardize everything they have worked their entire lives to earn to avoid facing the charges against him should not be seriously credited.

Lastly, the government has failed to explain why GPS location monitoring, home confinement, the watchful eye of a third-party custodian who has over half a million dollars of collateral at stake and the surrender of all travel documents would fail to ensure Mr. Coker's return to court. Accordingly, the government has failed to meet its burden of proof and these additional conditions should be deemed sufficient to ensure Mr. Coker's appearance.

## **Conclusion**

Mr. Coker, over the last several decades, has built a life for himself abroad that well predates the charges and conduct before this Court. Mr. Coker's life abroad is not evidence that he seriously wishes to flee the charges against him. In fact, Mr. Coker has done virtually everything he could after he was indicted to demonstrate that he *does not* want to flee, including waving extradition, not legally contesting the charges against him from abroad, not adopting a false identity or hiding his location, or absconding to a country without an extradition treaty with the United States of America—despite, according to the government, having the means to do so.

---

[2] *See e.g.* CNBC, *Fugitive $100 million New Jersey deli defendant Peter Coker Jr. arrested in Thailand*, available at https://www.cnbc.com/2023/01/18/fugitive-new-jersey-deli-defendant-peter-coker-jr-arrested-in-thailand.html.

The government has failed to show that there are no conditions that will reasonably assure Mr. Coker's return to court.

                                               Respectfully submitted,

                                               **WHIPPLE AZZARELLO, LLC**

                                        By:   s/ John A. Azzarello
                                                        John A. Azzarello
                                                        Adam M. Elewa

Cc: Shawn P. Barnes, AUSA (by ECF).