UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Christine P. O'Hearn, U.S.D.J. |
| v. | : | Crim. No. 22-643 (CPO) |
| PETER COKER, JR. | : | **BRIEF OF UNITED STATES** |
| | | **IN SUPPORT OF MOTION FOR** |
| | : | **REVOCATION OF ORDER OF** |
| | | **RELEASE** |

The United States respectfully moves for revocation of the Order of Release of defendant Peter Coker, Jr. ("Coker, Jr." or the "Defendant") because the Defendant represents a serious flight risk and there are no conditions or combination thereof that can reasonably insure the Defendant's appearance at future proceedings.

As the Government has previously noted, there is no evidence that is more telling than a defendant's own words. When the Defendant renounced his United States citizenship on June 5, 2019, he stated:

> While I was born and raised in the U.S., I moved to Hong Kong in July, 1992 for career reasons and have established my roots and <u>extensive</u> social and family ties here. I have no intention to return to live or work in the U.S., and have therefore decided to renounce my U.S. nationality.

Gov. Ex. A, p. 5 (emphasis added). Indeed, it is the Defendant's "extensive" ties to foreign countries, access to large amounts of money, and minimal ties to the United States – where he has not lived for over 30 years – that form the basis for the Government's position that the Defendant is a flight risk.

1

## I.    <u>PROCEDURAL HISTORY</u>

On September 26, 2022, the Defendant was charged by way of Indictment with conspiracy to commit securities fraud, in violation of Title 18, United States Code, Section 371 (Count One), securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2 (Count Two), and conspiracy to manipulate securities, contrary to Title 15, United States Code, Sections 78i(a)(2) and 78ff, and Title 18, United States Code, Section 2, in violation of Title 18, United States Code, Section 371 (Count Three).

At the request of the United States, on or about January 11, 2023, the Defendant was arrested on a provisional arrest warrant in Phuket, Thailand, pending extradition to the United States. The Defendant was returned to the United States, in law enforcement custody, on March 15, 2023. On that date, the Defendant appeared before the Honorable Michael A. Hammer, United States Magistrate Judge, for an initial appearance and arraignment, at which time he consented to detention pending submission of a bail package. (Docket Entries ("D.E.") 34-36).

## II.    <u>RELEVANT FACTS</u>

In 2014, Individual-1 and Individual-2 began the process of opening a local deli in Paulsboro, New Jersey (the "Deli"). Co-defendant James Patten, a long-term friend of Individual-1, offered to assist by incorporating the deli so that Individual-1 and Individual-2 could potentially expand. The Deli was opened under the name

"Your Hometown Deli" on October 14, 2015—the Deli was opened under the umbrella corporation Hometown International ("Hometown"), of which it was a wholly owned subsidiary. Patten encouraged and instructed Individual-2 and Individual-1 to create the umbrella corporation.

Individual-1 and Individual-2 managed the day-to-day operations of the Deli, which never made much money and ultimately operated at a loss. Initially, Individual-1 was listed as the president of Hometown and Individual-2 the vice-president, but the investigation revealed that they were mere nominee officers. Patten, serving as an unnamed control person, was primarily responsible for Hometown's operations and directed Individual-1 and Individual-2 with respect to any efforts necessary for Hometown's corporate actions. Patten worked alongside, and in concert with, two associates during the scheme—Peter Coker, Sr., with whom Patten worked at Tryon Capital in Chapel Hill, North Carolina, and his son, the Defendant, Peter Coker, Jr.

The investigation revealed that the Defendant, Patten, Coker, Sr., and others orchestrated a market manipulation scheme to artificially increase the stock price of Hometown (and another shell company, E-Waste, discussed below) in an effort to market the shell company at an artificially high price for international buyers seeking to take a private company public on the United States markets. They were able to execute this scheme by coordinated trading among a small group through a combination of wash and match trading. They were successful in artificially inflating Hometown's share price. On the first day of trading, October 25, 2019,

Hometown's closing price was approximately $1.25. On April 16, 2021, Hometown closed at approximately $12.99 per share (a net price increase of approximately $11.74), representing an approximate 939% increase from the first trading day.

Almost immediately after Hometown's creation, Patten and Coker, Sr. arranged the sale and/or gifting of Hometown shares to a number of their family members and close associates. The "OTC Link Alternative Trading System" is an alternative trading system, or "ACS," that contains three tiers of markets, which are largely based on the quality and quantity of the listed companies' information and disclosures. "OTC Pink" is the lowest tier, and most speculative of the marketplaces. "OTCQB" is the middle tier, which requires that listed companies meet certain eligibility standards. "OTCQX" is the top tier of the three marketplaces and requires that listed companies meet more stringent eligibility requirements (altogether, the "OTC Marketplace"). Patten, Coker, Sr., and Coker, Jr. disseminated Hometown shares in an effort to get the stock publicly listed, as the OTC Marketplace requires a certain number of shareholders. In October 2019, Hometown began trading on the OTC Pink Market, a lesser-regulated, more decentralized market for trading.

Additionally, as part of the scheme, Patten, Coker, Sr., and Coker, Jr. facilitated the transfer of a majority share of Hometown stock from Individual-1 and Individual-2 to foreign entities that were surreptitiously controlled by Coker, Jr. at a nominal rate. Once in Coker, Jr.'s hands, the value of these shares was artificially inflated through the above market manipulation scheme.   More specifically, in

4

December 2019, Patten, Coker, Sr., and Coker, Jr. facilitated the sale of two million shares held by Individual-1 and Individual-2 (constituting 38% of the outstanding stock) to COKER, JR. for $3,000. In February 2020, Patten orchestrated the sale of an option to purchase Individual-2's remaining 1.5 million shares (28% of the outstanding stock) to COKER, JR. for $500.

"Coordinated Trading Events" or "CTEs" are trading events, such as match trades and wash trades, that are used to create the appearance that a given stock price rose as a result of genuine market demand for the respective security. Patten, Coker, Sr., and Coker, Jr. facilitated the artificial inflation of Hometown's stock through match and wash trading and attempted to use Hometown as a vehicle to acquire another entity through a reverse merger in order to ultimately sell their shares at an artificially inflated price.

Patten, Coker, Sr., and Coker, Jr. also orchestrated the execution of consulting agreements between Hometown and their respective firms and entities under their control. The consulting agreements were arranged by Patten, who signed Individual-1's name on the Form 8-K, the form used to notify investors of significant or important events, announcing the arrangements. In total, Hometown paid consulting agreements in the amounts of $15,000 per month to Coker, Sr. through Tryon Capital, and $25,000 per month to Coker, Jr. through VCH Limited a Macau entity.

Coker, Jr. became Hometown's Chairman of the Board in February 2020. In March 2020, Coker, Jr. exercised the option to purchase Individual-2's shares.

During the following month, Patten, Coker, Sr., and Coker, Jr. transferred all 3.5 million of these shares to four nominee entities located in Macau, China, all of which were controlled by Coker, Jr. More specifically: on April 6, 2020, Coker, Jr. "sold" 2 million shares for $.0015 per share to Global Equity Limited; and on April 15, 2020, Coker, Jr. "sold" the remaining 1.5 million shares for $.0015 per share to VCH Limited, IPC-Trading Company, and RTO Limited. Based on emails obtained as part of the investigation, these nominee entities are controlled by Coker, Jr.

In March 2020, Hometown issued 100,000 shares of common stock to Europa Capital Investments, LLC—an entity controlled by Coker, Sr. and another co-conspirator ("Co-Conspirator-1")—in exchange for approximately $144,000 in debt owed by Hometown to Europa Capital. Approximately two months later, Europa "gifted" 100-500 block shares to approximately 21 individuals, nearly all of whom have a relationship with Patten, Coker, Sr., or Co-Conspirator-1.

The targets spread out the stock for three primary reasons: 1) to give regulators and the marketplace the impression that there were more investors than there actually were; 2) to put shares in the hands of friends and associates in order to facilitate CTEs; and 3) to give the false impression of an arm's-length relationship between themselves and the shareholders. These motivations became critical when the co-conspirators "uplisted" Hometown to a more desirable OTC Marketplace tier.

In June 2020, Hometown filed a Form S-1 Registration Statement (the "Form S-1") in order to register 2.7 million shares with the Securities and Exchange

6

Commission ("SEC"). Despite the fact that these 2.7 million shares included shares owned by Coker, Jr.'s nominee entities, Coker, Sr., Europa Capital, and at least seventeen individuals who were either related to or associated with Patten, Coker, Sr., and Coker, Jr., the Form S-1 stated "[n]one of the Selling Shareholders nor any of their respective affiliates have held a position or office, or had any other material relationship, with us or any of our predecessors or affiliates."

The registration of the 2.7 million shares allowed Hometown to be uplisted from the OTC Pink to the OTCQB market. This elevation was beneficial in that: 1) it provided fewer obstacles to trading; 2) it provided higher visibility for Hometown; 3) it allowed shareholders to sell their shares at a price higher than $6.50 per share, the amount at which it had previously been capped; and 4) it provided a level of legitimacy to Hometown, which was beneficial in the quest for a reverse merger.

In April 2020, Patten, Coker, Sr., and Coker, Jr. arranged a private placement of 2.5 million shares to three accredited investors for gross cash proceeds of $2.5 million. The funds were transferred into the Hometown International checking account, to which Patten had access. In the weeks following the transfer, Patten transferred more than $291,000 to Coker, Sr.'s personal account, over $47,000 to Europa Capital, over $95,000 to Tryon Capital, and $100,000 to VCH Limited.

In May 2020, Hometown entered into consulting agreements with Tryon Capital (controlled by Coker, Sr. and Co-Conspirator-1 and also associated with Patten) and VCH Limited (one of Coker, Jr.'s nominee entities). As noted, bank

records show that Hometown funneled $15,000 per month to Coker, Sr. through Tryon Capital, and $25,000 per month to COKER, JR. through VCH Limited. According to Individual-1, Patten instructed him to wire money to VCH Limited.

Patten, Coker, Sr., and Coker, Jr. also orchestrated the artificial inflation of Hometown's stock price through manipulative trading (or CTEs). They accomplished this by coordinating match and wash trades with nominee accounts over which they had control and other associates. Patten used the brokerage accounts of numerous friends and associates (which had been listed in the Form S-1); Coker, Sr. traded in his own brokerage account, as well as his wife's; and Coker, Jr. arranged for an associate ("Co-Conspirator-2") to set up a brokerage account, which was also used to commit CTEs with the Coker, Sr. and Patten-controlled accounts.

Between May 8, 2020 and April 15, 2021, the manipulative trading that Patten, Coker, Jr. and Coker, Sr. orchestrated resulted in an increase of Hometown's stock value from $6.00 per share to $13.90 per share. Patten kept track of all of the trades by receiving reports on a weekly basis and reporting back to Coker, Jr. and Coker, Sr.

The scheme involving E-Waste, Corp. ("E-Waste") was similar to the scheme involving Hometown. E-Waste was a publicly traded, albeit failing, company. In September 2020, Patten approached another long-time friend ("Individual-3") about assisting E-Waste with a reverse merger. Shortly thereafter, Individual-3 was

appointed CEO of E-Waste, although Patten was effectively in control and made substantive decisions on behalf of the company.

Over the following weeks, the targets orchestrated the transfer of millions of E-Waste shares into their own names and the names of the same nominee entities and engaged in a series of CTEs. Patten, Coker, Sr., and Coker, Jr. then sought to profit from E-Waste by entering into consulting agreements, arranging a private placement of stock, and by inflating E-Waste's stock price. Between July 2020 and April 2021, Patten, Coker, Sr., and Coker, Jr. orchestrated a number of match and wash trades, which ultimately had the impact of raising E-Waste's stock price from $.10 per share to $10.00 per share. Emails from Patten, Coker, Sr., and Coker, Jr., along with IP records, support the market manipulation theory related to E-Waste.

On April 16, 2021, multiple news articles were published that questioned the validity/legality of Hometown and E-Waste's inflated stock prices.

In September 2021, E-Waste merged with EZRaider Global, Inc. A registration statement has not yet been filed—the co-conspirators have not yet sold their shares of E-Waste.

On March 31, 2022, Hometown announced that it had entered into a reverse merger with Makamer Holdings, Inc. Hometown's application to FINRA for a ticker symbol change remains pending—the co-conspirators have not yet sold their shares.

## III.   BAIL APPLICATION AND HEARING

As noted above, on March 15, 2023, the Defendant appeared before the Honorable Michael A. Hammer, United States Magistrate Judge, for an initial

appearance and arraignment, at which time the Defendant consented to detention pending an appropriate bail package. (D.E. 34-36). The following week, a bail review hearing was scheduled before the Honorable Edward S. Kiel, United States Magistrate Judge, for March 23, 2023. (See D.E. 39-40). However, immediately prior to the hearing, it was determined that Immigration and Customs Enforcement ("ICE") had lodged a detainer against the Defendant. Given the potential implications of the detainer, the hearing was postponed. On March 29, 2023, the Defendant appeared before the Honorable Cathy L. Waldor, United States Magistrate Judge, for a bail review hearing. During that hearing, the Government opposed the Defendant's application for bail and moved for pretrial detention on the ground that the Defendant posed a serious risk of flight. In a written report, United States Pretrial Services recommended that the Defendant be detained and indicated that there were no conditions or combination of conditions that could reasonably assure the Defendant's return to Court.

Judge Waldor denied the Government's motion for detention and granted the Defendant's motion for bail pursuant to the following conditions, among others:[1]

1.      $1,500,000 appearance bond secured by the equity in the following properties owned by the Defendant's parents and sister:

        a.  23102 Umstead, Chapel Hill, North Carolina;

---

[1] The bail order has not yet been entered as of this filing, but this list is based on the conditions set forth on the record, and memorialized in counsel's proposed Order, which was submitted to the Court on March 30, 2023.

   b. 23104 Umstead, Chapel Hill, North Carolina;

   c. 23106 Umstead, Chapel Hill, North Carolina;

   d. 3905 West Friendly Ave., Greensboro, North Carolina; and

   e. 12804 Morehead, Chapel Hill, North Carolina.

2. Defense counsel shall perfect liens on the above properties in the relevant jurisdictions prior to the Defendant's release and provide verification of same to Pretrial Services and the Government.

3. The Defendant shall be released into the third-party custody of his mother, Susan H. Coker.

4. The Defendant shall submit to supervision by Pretrial Services.

5. Home Incarceration, with electronic monitoring, restricted to the residence under 24-hour lock-down except for medical necessities and court appearances or other activities specifically approved by the Court.

6. For the purpose of Location Monitoring, the Defendant shall install a land line telephone in his/her residence within 10 days of release, unless waived by Pretrial Services.

7. The Defendant is prohibited from internet access and the possession and/or use of computers or connected devices, at any location, unless in the presence of counsel.

8. Any cellphones possessed by third-party custodian must be password protected and verified by Pretrial Services.

9.     Surrender all passports and travel documents to Pretrial Services. Do not apply for new travel documents.

10.    Travel restricted to court appearances in the District of New Jersey or to visit attorneys in Morristown, New Jersey and New York, New York; all other travel must otherwise be approved by Pretrial Services.

11.    Maintain residence at 12408 Morehead, Chapel Hill, North Carolina, with third party custodian.

12.    Avoid all contact, direct or indirect, with anyone who is or may become a victim or potential witness in the subject investigation or prosecution including: Any co-defendants, co-conspirators, or witnesses, with the exception of contact with his father/co-defendant but he must not discuss the case unless in the presence of counsel.

13.    Do not engage in the business of trading securities, except that the Defendant may liquidate his own personally held securities.

14.    Abide by all ICE directives.

15.    The Defendant shall not possess any financial documents, bank cards, or identification that is not issued in his name.

16.    The Defendant is not permitted to assume new debt or open new lines of credit.

17.    The Defendant is not permitted to seek any new identity documents, such as passports, or use any other individuals' identity.

18.    The Defendant shall report to Pretrial Services by 9:00 a.m. the following business day immediately following his release from Immigration and Customs Enforcement for the installation of location monitoring.

Judge Waldor ordered that the Defendant remain in custody until all the conditions had been met. Additionally, Judge Waldor granted the Government's request for a stay of the Court's Release Order through Monday, April 3, 2023.

As explained in more detail below, the Government opposes the Defendant's release on bail. The Defendant poses a significant risk of flight, given, among other things, the nature and seriousness of the offense, the lengthy sentence the defendant faces if convicted, the Defendant's significant international ties, and the Defendant's lack of ties to the United States. Accordingly, the Government moves to revoke Judge Waldor's Order of pretrial release.

## IV.    **ARGUMENT**

Pre-trial release and detention are governed by the Bail Reform Act of 1984, codified in 18 U.S.C. §§ 3141–56. Section 3142(f)(2) provides that the Government may seek to detain a defendant pending trial in situations where, as here, the Government establishes by a preponderance of the evidence that there is a "serious risk that [the defendant] will flee." The burden of proof that the Government must meet – preponderance of the evidence – requires the Government to establish that there is a greater than 50% probability that the claim is correct. As outlined in Section 3142(e), a defendant should be detained where, "after a hearing . . . the judicial officer finds that no condition or combination of conditions will reasonably

13

assure the appearance of the person as required . . ." Section 3142(g), in turn, provides several factors that this Court must consider in making that determination, including "the nature and circumstances of the offense charged," "the weight of the evidence against the person," "the history and characteristics" of the defendant, including:

> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." These factors weigh decisively in favor of the Defendant's continued detention.

A district court reviews a magistrate judge's bail decision *de novo*. *United States v. Delker*, 757 F.2d 1390, 1394 (3d Cir. 1985). "While the district court may find it useful to consider the decision and reasoning of the magistrate judge, the Court must make an independent determination regarding a defendant's eligibility for release on bail." *United States v. Livingston*, 2016 WL 1261464, at *1 (D.N.J. Mar. 31, 2016). In this regard, the Government notes that the Magistrate Judge did not give the appropriate weight to the Defendant's renunciation of his United States citizenship. Indeed, in ruling on the matter, the Court noted:

> I'm not – I – I'm not looking to incarcerate somebody or not incarcerate somebody because they renounce their citizenship. I – I understand Mr. Barnes' point that that goes to intention not to hang around or to flee, but I'm – I'm not persuaded by that, Mr. Barnes, frankly by him renouncing his citizenship.

Mot. Tr. 44, 13-18. The Government maintains our position that the Defendant's renunciation of his citizenship demonstrates not only a significant lack of ties to the United States, but a specifically stated intent to live his life elsewhere.

The facts in this case demonstrate, well-beyond the preponderance of the evidence standard, that there are no conditions or combinations sufficient to insure the Defendant's appearance at future proceedings.

In terms of the nature and circumstances of the offense and the weight of the evidence, as outlined above, the Defendant engaged in a long-term, complex fraud scheme that relied upon shell corporations, straw stock-holders, false filings, and manipulative stock trading to create an illusion of a corporate entity with genuine market interest; without this, the fraud could not succeed. Moreover, the Defendant was a critical participant in the scheme – without his international business knowledge, connections, and skills, the scheme would not have worked.

Once the Defendant and his co-conspirators took Hometown public, the Defendant, through his shell corporations, took control of a majority of the stock. The Defendant and his co-conspirators masked their ownership interest in Hometown in order to give the false impression of an arms-length relationship, when in reality, they controlled every aspect of the corporation.

The Defendant and his co-conspirators also spread nominal shares of Hometown stock around their friends, associates and family members – including the Defendant's sister, who has offered her home and multiple other properties as part of the Defendant's proposed bail package. The Defendant and his co-conspirators also placed shares of Hometown stock in brokerage accounts registered to the Defendant's niece and nephew. To be clear, the Defendant and his co-conspirators did not spread the stock around as an "investment opportunity," of sorts; rather, they spread the stock in order to give the appearance of genuine investor interest and broaden their investor base in order to up-list Hometown to a more desirable market. And despite the fact that Coker, Jr.'s shell companies, located in Macau, China, held 2.7 million Hometown shares, the Defendant and his co-conspirators still filed a fraudulent S-1 Form with the SEC certifying that "none of the selling shareholders nor any of their respective affiliates had any material relationship with us or any of our predecessors or affiliates."

And once the Defendant and his co-conspirators had established a sufficient "investor-base," they systematically manipulated the price of the stock through illegal, manipulative trading, such as match trades and wash trades, in order to artificially inflate the price of Hometown's stock. Indeed, over approximately eighteen months, the Defendant and his co-conspirators manipulated the price of Hometown's stock for an increase of approximately 939 percent – that is, from $1.25 per share to $12.99 per share. This Defendant then arranged for a private placement of Hometown shares with a foreign business in exchange for $2.5 million,

which the Defendant and his co-conspirators used to pay themselves exorbitant consulting fees totaling over $800,000. And the only reason that the Defendant and his co-conspirators were unable to achieve their ultimate objective of entering into a reverse merger, which would have allowed for a massive payout, was because of negative news articles that exposed their fraud.

This scheme was not just a simple "pump and dump" scheme. This was a complex fraud that took years to develop – indeed, by his own words, the Defendant stated "WE HAVE CURATED HOMETOWN FROM DAY 1 . . ITS BEEN AROUND FOR 6 YEARS OR SO." See Gov. Ex. B. In reality, the Defendant and his co-conspirators' scheme was a complex, long-term fraud, running at least seven years, that was geared towards a reverse merger, not merely "dumping" their overinflated shares back onto the market.

Additionally, the weight of the evidence against the Defendant is overwhelming. The Defendant took control of a majority position of Hometown's stock and then placed it with shell corporations that he controlled – a fact that is corroborated by the Defendant's own email communications. In those same email communications, the Defendant: 1) arranged business transactions, 2) liaised between foreign investors and his co-conspirators and 3) facilitated communications with Co-Conspirator-2, an overseas "investor" who played a significant role in the match trades and wash trades that fraudulently drove up Hometown's value. Indeed, when introducing Co-Conspirator-2, the Defendant stated "LETS TRY TO

17

KEEP THE EXPOSURE ONLY AT WHAT WE NEED I DON'T WANT TO BURN

HIM OUT SO ORDERS OF 100-200-300 DAILY IS DO-ABLE . ."

Thus, the nature and circumstances of the offense and the weight of the

evidence weigh decisively in favor of detention.

Additionally, the maximum penalties that the Defendant faces are

significant. The defense has understated the Guidelines calculations in this case.

The Government certainly acknowledges the impact of <u>United States v. Banks</u>, 55

F. 4th 246 (3d Cir. 2022) – but the defense has ignored the over $800,000 in

consulting fees that the Defendant and his co-conspirators were paid by Hometown

for their no-show jobs. The objective of the scheme was certainly to enter into a

reverse merger, which would result in a lucrative payday. Nevertheless, the

Defendant and his co-conspirators certainly made money from Hometown along the

way. By the Government's calculations, Count Two (securities fraud), carries:

- A base offense level of 7 (U.S.S.G. § 2B1.1(a)(1));

- A 14-level enhancement because the loss amount exceeds $550,000 (U.S.S.G.
  § 2B1.1(b)(1)(H));

- A 2-level enhancement because a substantial part of the fraud occurred
  outside the United States or the offense involved sophisticated means
  (U.S.S.G. § 2B1.1(b)(10));

18

- Resulting in a total offense level of 23, which, when coupled with a criminal history category I, results in an advisory Guidelines range of 46-57 months, and squarely falls within Zone D of the Sentencing table.

Moreover, the Defense fails to acknowledge the possibility of any upward departures based on an inadequacy in loss amount.

The statutory maximum penalties are significant as well – Counts One and Three carry five-year maximum terms and Count Two carries a twenty-year maximum term.

Thus, the Defendant faces significant penalties. And while the defense has raised concerns that the length of the Defendant's pretrial detention may exceed any subsequent term of incarceration, such due process concerns are simply not an issue at this juncture, particularly in light of the fact that the Defendant has only been in custody for approximately three weeks.

Additionally, the Defendant's use of shell corporations and straw entities to mask his ownership interest present the same concerns as a defendant's use of aliases. The Government certainly acknowledges that there is no evidence that the Defendant used actual aliases for himself, but on this point, we note that the Defendant created at least four foreign shell corporations, based in Macau, China, that he used to mask his ownership interest – more specifically – to mask his position as a majority shareholder in Hometown. And, the Government is in possession of emails that the Defendant sent discussing the need to put shares in

19

other company's names to avoid appearing too "close." So, while Coker, Jr. has never utilized an alias to mask his personal identity, he certainly has utilized shell corporations to mask his identity as a majority shareholder in order to further this fraud. Moreover, as described above, the Defendant used countless nominees as straw stockholders to facilitate the scheme. The Defendant's use of shell corporations and straw stockholders was intended to deflect regulators' attention from his ownership interests – it is certainly a distinct possibility that the Defendant would undertake steps to deflect the authorities' attention from his status as a fugitive were he to decide to flee.

Significantly, the Defendant has extensive ties to foreign countries. The Government certainly acknowledges that the Defendant has family members in the United States. But this fact did not stop him from formally renouncing his citizenship in 2019. And again, the Defendant's own words regarding his renunciation are telling:

> While I was born and raised in the U.S., I moved to Hong Kong in July, 1992 for career reasons and have established my roots and <u>extensive</u> social and family ties here. I have no intention to return to live or work in the U.S., and have therefore decided to renounce my U.S. nationality.

Gov. Ex. A, p. 5 (emphasis added). And despite the family ties that the Defendant now claims assure his appearance, he left the United States over thirty years ago and has been living abroad ever since.

Additionally, the Defendant has no financial ties to the District of New Jersey. He does, however, have extensive ties to executives with access to large

amounts of money outside the United States. Indeed, the Defendant's foreign ties are among the most significant factors here. The Defendant renounced his United States citizenship, and obtained citizenship in St. Kitts, which he used to enter Hong Kong and Thailand. He established significant business connections in both countries – indeed, the Defendant participated in the instant offense while in Hong Kong and he used his knowledge of multiple Hong Kong businesses, and his connections to business executives in those countries to commit this offense.

According to the Pretrial Services Report, the Defendant has $3,000,000 in a foreign checking account in Hong Kong. Additionally, the Defendant owns property – valued at $500,000 – in Panama. As to whether the Defendant holds any assets in St. Kitts – the country in which he holds citizenship – the Defendant indicated that it is possible, but that he is unsure.

Finally, the Defendant did not return to the United States voluntarily. Despite his assertions to the contrary, the Defendant did not return to the United States voluntarily; rather, he was arrested on January 11, 2023, and remained in a Thai jail until he was transferred into the custody of federal agents. The Government acknowledges that the Defendant waived the formal extradition process, but not until he was already in custody. Simply stated, the Defendant did not voluntarily board a flight to answer these charges – he returned to the United States in the custody of federal agents.

And the Defendant's assertion that he could have mounted legal challenges to this case from abroad wholly ignores the fugitive disentitlement doctrine. Indeed,

"[i]n <u>Bossert v. Attorney General of U.S.</u>, 343 Fed. Appx. 801, 805, n. 2, the Third Circuit noted that 'pursuant to the Fugitive Disentitlement Doctrine, a criminal defendant who has <u>failed to surrender</u> may be barred from calling upon the resources of a court.' citing <u>Molinaro v. New Jersey</u>, 396 U.S. 365 (1970)." <u>United States v. Donahue</u>, 2011 WL 13364481 (M.D. Pa. Jan. 14, 2011) (emphasis added).

The defense argument that Coker, Jr. could have fled to a country that did not have an extradition treaty with the United States is incomplete. Law enforcement received credible information indicating that after he learned of the Indictment, the Defendant actively attempted to determine the type of wants and warrants that were in place. Perhaps the Defendant's decision to remain in Thailand was motivated by concerns of being arrested at the border.

But despite the Defendant's motivations for remaining in Thailand, one salient fact remains: he returned to the United States in the custody of federal law enforcement, not of his own volition.

The Government maintains that the above facts demonstrate that the Defendant poses a serious flight risk. And while these facts demonstrate, beyond the preponderance of the evidence standard, that there are no conditions or combinations thereof that can insure his appearance, they also demonstrate the inadequacy of the present bail package.

The Defendant's bail package relies on collateral from two parties: his parents and his sister. The concept of securing an individual's bail with collateral owned by family members operates on the premise that a defendant would not flee

because such flight would have a negative impact on their family members. But when, as is the case here, that premise is incorrect, the collateral is meaningless.

The Defendant's father is also his co-defendant and was one of his co-conspirators. Notably, the elder Mr. Coker traveled from North Carolina to Camden, New Jersey and appeared before the Honorable Christine P. O'Hearn, United States District Judge, on October 11, 2022 for an arraignment. The Defendant, on the other hand, remained in Thailand, allowing his 80-year-old father to answer for their collective misdeeds. But now, the Defendant asks this Court to credit his assertions that he will not flee because such flight would have a harmful impact on his father.

The Defendant also allowed one of his co-conspirators, James Patten, to use a brokerage account in his sister's name to commit match trades and wash trades – indeed, Coker, Jr.'s sister is referred to as "Individual-5" in the Indictment and the Defendant's criminal conduct utilizing her account appears in Paragraph 4(l)(iii), which states:

> On or about February 22, 2021, at approximately 11:21 a.m., the account registered to Co-Conspirator-2 placed two orders to purchase 100 shares of Hometown International for $13.85 per share from an IP Address associated with COKER, SR. Approximately two hours later, at 11:21 a.m., one order was filled by an account registered to COKER, SR. from an IP Address that resolved to PATTEN'S residence. Shortly thereafter, at approximately 12:07 p.m., the second order was filled by an account registered to Individual-5 from an IP Address that resolved to PATTEN'S residence.

23

The Defendant also allowed Mr. Patten to use brokerage accounts in the Defendant's nephew's name, who is referred to as "Individual-7" in the Indictment, and the Defendant's niece's name, who is referred to as "Individual-8" in the Indictment. Indeed, the Defendant's criminal conduct utilizing Individual-7's account appears in Paragraph 4(t)(i), which states:

> On or about November 19, 2020 at approximately 11:21 a.m., an account registered to Individual-7 placed an order to buy 100 shares of E-Waste for $2.66 per share from an IP Address that resolved to PATTEN'S residence. Approximately two minutes later, at approximately 11:23 a.m., the order was filled by an account registered to Individual-3 from the same IP Address, which, again, resolved to PATTEN'S residence.

And in Paragraph 4(t)(v), which states:

> On or about April 9, 2021, at approximately 1:27 p.m., an account registered to Individual-7 placed an order to purchase 100 shares of E-Waste for $10.00 per share from an IP Address that resolved to PATTEN'S residence. Approximately ten minutes later, at 1:37 p.m., the order was filled by an account registered to Individual-3 from the same IP Address, which, again, resolved to PATTEN'S residence.

And in one instance, the Defendant and his co-conspirators used Individual-7 and Indivdiual-8's accounts in the same wash trade. This particular illegal conduct appears in Paragraph 4(t)(iv), which states:

> On or about March 22, 2021, at approximately 2:17 p.m., an account registered to Individual-7 placed an order to purchase 176 shares of E-Waste for $9.46 per share from an IP Address that resolved to PATTEN'S residence. Approximately two minutes later, at 2:19 p.m., the order was filled by an account registered to Individual-8 from the same IP Address, which, again, resolved to PATTEN'S

24

residence.

The Government points these facts out not to besmirch the Defendant's family, but rather, to demonstrate that the Defendant was willing to use multiple family members' brokerage accounts – brokerage accounts that were in their names – in furtherance of a massive fraud. Indeed, the Defendant put his family members in the middle of a significant large-scale fraud because it benefitted him personally.

Simply stated, the Defendant's assertions that he would not flee because it would jeopardize his family members' homes is unsupported by the record; in fact, it is actually refuted. This Defendant does what is good for him, even if it means using a family member's account to commit crimes or letting an elderly parent, who is far less culpable than the Defendant, answer for the lion's share of their joint criminal activity.

And while $1.5 million, the approximate value of the collateral, sounds like a lot of money for an individual to put up for bail – it is a drop in the bucket for this defendant. The Defendant stood to make tens of millions of dollars from the Hometown transaction. Indeed, the Defendant demonstrated his financial prowess at multiple points in the conspiracy – at one point securing $2.5 million in actual funds from Chinese investors for a company that only had approximately $30,000 in assets. And the Defendant also has access to large amounts of overseas money personally. Indeed, he reported having $3,000,000 in Hong Kong accounts, property valued at $500,000 in Panama, and unknown potential assets in St. Kitts.

V.      **CONCLUSION**

The nature and circumstances of the Defendant's conduct are serious. Indeed, the Defendant was one of the primary architects of this large-scale, complex fraud that was calculated and honed over a number of years. Additionally, the weight of the evidence against him is overwhelming. The Defendant also faces significant penalties, both in terms of the Guidelines and the statutory maximum sentences. Thus, he certainly has the *motive* to flee.

The Defendant was arrested overseas and returned to the United States in custody – he did not return to the United States on his own accord. Additionally, the defendant has legal status – citizenship, in fact – that would permit him to stay in St. Kitts indefinitely. These points, when coupled with his self-admitted having "no intention to return to live or work in the U.S.," and access to large amounts of money – personally and through his international business network – demonstrate that he has the ability to live a very comfortable life in a country other than the United States. Thus, he certainly has the *means* to flee.

The Defendant's bail package is inadequate to assure his appearance – indeed, there are no conditions or combination thereof that can guarantee his appearance. The Defendant has the *motive* and the *means* to flee; this Court should deny him the *opportunity*.

26

For all the foregoing reasons, the Government respectfully submits that the Court should reverse the U.S. Magistrate Judge's Order of pretrial release, and grant the Government's motion for pretrial detention.

Respectfully submitted,

PHILIP R. SELLINGER
United States Attorney

SHAWN P. BARNES
LAUREN E. REPOLE
Assistant U.S. Attorney

Dated:          April 3, 2023

27