

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

---

*Shawn P. Barnes*  *970 Broad Street, 7th floor*  *973-645-2700*
*Assistant United States Attorney*  *Newark, New Jersey 07102*

April 13, 2023

Honorable Christine P. O'Hearn
United States District Judge
Mitchell H. Cohen Federal Building
    and United States Courthouse
401 Market Street
Camden, New Jersey 08101

      Re:    United States v. Peter Coker, Jr.
             Crim. No. 22-643 (CPO)

Dear Judge O'Hearn:

    A hearing on the Government's application to revoke the United States Magistrate Judge's March 29, 2023 Order granting bail in the above-captioned matter is scheduled to proceed **in-person** on **April 17, 2023 at 11:00 a.m.** before Your Honor. Please accept this reply brief in response to the Defendant's opposition papers.

### The Need for Detention and Inadequacy of the Proposed Package

    The facts in this case establish that this Defendant presents a heightened flight risk. Various facts— facts, not speculation— demonstrate, far beyond the requisite preponderance of the evidence standard, that the Defendant is a serious flight risk and that there are no conditions or combination thereof that can reasonably ensure his appearance.

    In our papers, the Government noted that the Defendant previously renounced his United States citizenship in June 2019. Indeed, in a statement on the renunciation forms that he completed at the U.S. Consulate in Hong Kong, the Defendant voluntarily stated:

> While I was born and raised in the U.S., I moved to Hong Kong in July, 1992 for career reasons and have established my roots and extensive social and family ties here. I have no intention to return to live or work in the U.S., and have therefore decided to renounce my U.S. nationality.

To be clear, the Government has never asserted that the Defendant's renunciation was in response to this case. Rather, the Government has discussed the Defendant's renunciation because it directly impacts the Defendant's community ties, a factor specified by 18 U.S.C. 3142(g) as having direct bearing on the flight analysis. When coupled with the fact that the Defendant has resided outside the United States for at least the past thirty years, which touches on another relevant consideration—the "length of residence in the community"—it is clear that the Defendant's renunciation of his U.S. citizenship constitutes a legitimate and significant concern under the Bail Reform Act and is not merely a "puzzling obsession," as counsel suggests.

The Government's position here is clear – this Defendant has minimal ties to the United States – but an abundance of ties, including significant financial assets, to foreign nations. The Government acknowledges that the Defendant has family in the United States – but again, this did not dissuade the Defendant from renouncing his citizenship and living abroad for the past thirty years. Moreover, the Defendant's ties to foreign nations are significant: 1) he has $3,000,000 in a checking account in Hong Kong; 2) he owns a $500,000 property in Panama; 3) he has reported travel to Hong Kong, Macau, Mexico, Thailand, and Japan; and 4) despite never actually residing in St. Kitts, he holds St. Kitts citizenship and may have "possible assets" there, according to the Pretrial Services Report. These facts go directly to the Defendant's "financial resources," another relevant consideration under § 3142(g).

Moreover, United States Pretrial Services has recommended that the Defendant be detained, noting in their March 23, 2023 report to Judge Waldor that "no condition and/or combination of conditions can reasonably assure the defendant's return to Court . . ."

And while the Government maintains the position that there are no conditions or combination thereof that can reasonably assure the appearance of the Defendant at future proceedings, the Government notes, *arguendo*, that the current bail package is inadequate for a number of reasons. As outlined in greater detail in our initial papers, the Defendant involved his family members in various aspects of his criminal conduct in this case. In addition to those instances, the Government notes that the Defendant and his co-conspirators caused Hometown to loan $150,000 to Med Spa Vacations Inc. – a company in which the Defendant's sister, the same sister whose property composes a significant portion of the Defendant's proposed bail package, was a significant stockholder, holding approximately 9.75 % of the company's stock.

It simply does not follow that a defendant who has involved his family members in such flagrant criminal conduct suddenly has developed the empathy and concern that would dissuade him from fleeing because of the impact it would have on his family members.

## The Defendant's Extradition

The Defendant did not return to the United States voluntarily – he was brought to the United States in handcuffs in the custody of federal agents. The Defendant certainly could have challenged his extradition in Thailand, but in all likelihood, he would have mounted such challenges from a Thai prison cell. The Defendant's decision to waive extradition is elucidated by counsel's prior statements regarding the Defendant's time in Thai custody. In short, the Defendant's decision to waive extradition was made <u>after</u> he was arrested – he did not board a plane on his own accord and voluntarily return to the United States to answer these charges.

## The Loss Amount

The Defendant's assertions that there is no loss associated with this case are incorrect. To be clear, the Government fully appreciates the impact of <u>United States v. Banks</u>, 55 F.4th 246, 258 (3d Cir. 2022) on this case – indeed, but for the <u>Banks</u> decision, the loss amount would be considerably higher. Nevertheless, the <u>Banks</u> holding does not lead to the conclusion that this is a no-loss case. <u>Banks</u> held that only actual loss could be considered in determining the applicable Guidelines range under U.S.S.G. § 2B1.1. <u>Id.</u> at 258. In so holding, the <u>Banks</u> Court explicitly prohibited the inclusion of intended loss in the loss calculation. <u>Id.</u>

Here, the Defendant and his co-conspirators undertook a calculated, complex scheme in order to 1) secure Hometown's place in a publicly traded market, 2) obtain a strong majority shareholder position in Hometown, and 3) engage in manipulative trading practices in order to artificially inflate the price of Hometown's stock in order to enter Hometown into a reverse merger yielding a significant profit. This plan was frustrated by negative publicity and the Defendant and his co-conspirators were not able to profit from the planned reverse merger. This is intended loss and should not be considered within the § 2B1.1 loss amount under <u>Banks</u>.

However, the Defendant and his co-conspirators engaged in a number of other fraudulent practices in furtherance of the conspiracy that do, in fact, constitute actual loss and are appropriately considered within the § 2B1.1 loss calculation. More specifically, in or around mid-April 2020, the Defendant and his co-conspirators secured a total $2.5 million private placement of Hometown shares from three investors, including:

- $456,250 from Maso Capital Investments Limited PO;
- $663,750 from Star V Partners LLC; and
- $1,280,000 from Blackwell Partners LLC.

Almost immediately, the Defendant and his co-conspirators began paying themselves, through "consulting fees." Indeed, some of those "consulting fees" included:

- $364,750 paid to Tryon Capital, which was controlled by Peter Coker, Sr., from April 24, 2020 through April 2, 2021;
- $250,000 paid to VCH Limited, which was a Macau-based shell corporation controlled by the Defendant, from July 2, 2020 through April 6, 2021; and
- $97,850 paid to Benchmark Capital, which was controlled by James Patten, from June 3, 2021 through March 31, 2022.

And besides the consulting fees, the Defendant and his co-conspirators paid themselves through a number of other payments, some of which were direct, including:

- $8,000 paid to Tryon Capital from April 24, 2020 through April 2, 2021;
- $47,863.08 paid to Europa Capital, another entity controlled by Peter Coker, Sr., on or about April 24, 2020;
- $332,622.57 paid directly to Peter Coker, Sr. and Peter Coker, Jr. from on or about April 24, 2020 through April 13, 2021; and
- $1,312 paid to Benchmark Capital from June 3, 2021 through March 31, 2022.

The Defendant's position that these "consulting agreements" and direct payments constitute "gains" but not "losses" asks this Court to adopt a short-sighted view and only focus on one side of a two-sided transaction. While the object of a theft represents "gain" to the thief, it also represents "loss" to the victim. Thus, the consulting fees are appropriately considered losses under the Guidelines.

     The entire $2.5 million could rightfully be considered loss. But even under a more conservative approach that only includes the consulting agreements and direct payments, the loss amount falls in the range between $550,000 and $1,500,000, which carries a 14-level enhancement under U.S.S.G. 2B1.1(b)(1)(H). This enhancement, when coupled with a base offense level of 7, under U.S.S.G. § 2B1.1(a)(1), and a 2-level enhancement because of the offense's sophisticated means under U.S.S.G. § 2B1.1(b)(10), the total offense level is 23, which results in a guidelines range of 46-57 months' incarceration.

     The Defendant has been in custody since March 15, 2023 – approximately one month. And even if the time spent in custody during the pendency of his extradition – beginning January 11, 2023 – was considered, he has just over three months in custody. At this point, there is simply no concern that the Defendant's pretrial detention will exceed the term of incarceration to which he is sentenced.

## Conclusion

For the foregoing reasons, and those outlined in the Government's April 3, 2023 submission, the Government respectfully submits that the Court should reverse the U.S. Magistrate Judge's Order of pretrial release, and grant the Government's motion for pretrial detention.

Respectfully submitted,

PHILIP R. SELLINGER
United States Attorney

By:   SHAWN P. BARNES
LAUREN E. REPOLE
Assistant U.S. Attorneys