

**U.S. Department of Justice**
*United States Attorney*
*District of New Jersey*

*Lauren E. Repole*
*Shawn P. Barnes*
*Assistant United States Attorneys*

*970 Broad Street, Suite 700*
*Newark, New Jersey 07102*

August 28, 2023

Via ECF
Honorable Christine P. O'Hearn
United States District Judge
Mitchell H. Cohen Federal Building
    and United States Courthouse
401 Market Street
Camden, New Jersey 08101

        Re:    United States v. Peter Coker, Jr.
                 Crim. No. 22-643 (CPO)

Dear Judge O'Hearn:

      A hearing on Defendant Peter Coker, Jr.'s (the "Defendant" or "Coker, Jr.") Motion for Reconsideration of this Court's Order of Detention, ECF No. 71 (the "Motion"), is scheduled for **September 5, 2023 at 3:00 p.m.** before Your Honor. The United States respectfully submits this letter brief in opposition to the Defendant's renewed request for release pending trial.

      On April 17, 2023, Your Honor correctly found that the Defendant was a flight risk and should be detained pending resolution of this case. Your Honor ruled that there is no condition or combination of conditions that could reasonably assure the Defendant's appearance at trial. Ex. A ("Tr.") at 37:3-6. Your Honor highlighted that the Defendant knew for approximately four months that he had been indicted and made "no effort whatsoever to surrender, communicate with the government or in any way contact the government and is only [in the United States] because the government traveled to Thailand to arrest him and extradite him." Tr. at 37:24-38:2. Your Honor also noted, among other things, that Coker, Jr. renounced his United States citizenship, maintains citizenship in St. Kitts, has minimal ties to the United States, has significant foreign business and personal ties, and is charged with a complex fraud scheme. Tr. at 37-39. In short, the Court's determination that no

condition or combination of conditions can reasonably assure the defendant's appearance had (and has) more than ample support.

Now, the Defendant raises many of the same arguments, asking for the Court to reconsider its prior decision to detain him. He also proposes that his own money be used to secure his release.

For the reasons set forth below, the Government requests that the Court continue detention as previously ordered, as there remains no condition or combination of conditions that would assure the Defendant's future appearance.

## Factual and Procedural Background

The Court is certainly familiar with the facts of this case. It is nonetheless important to highlight the complexity of this scheme—all of which Coker, Jr. facilitated while operating outside of the United States. Coker, Jr., along with his co-defendants James Patten, Peter Coker, Sr., and others, orchestrated a market manipulation scheme to artificially increase the stock price of Hometown International ("Hometown") and E-Waste Corp. ("E-Waste") in an effort to market the shell companies at an artificially high price for international buyers seeking to take a private company public on the United States markets, all to enrich themselves. They were able to execute this scheme by coordinated trading among a small group of "investors" who they monitored and controlled. Coker, Jr., with the assistance of his co-conspirators, facilitated the transfer of the majority share of Hometown and E-Waste stock at a nominal rate to foreign entities that were surreptitiously controlled. Once in Coker, Jr.'s hands, the value of these shares was artificially inflated through the market manipulation scheme.

Coker, Jr. became Hometown's Chairman of the Board in February 2020. As part of the scheme, in April 2020, Patten, Coker, Sr., and Coker, Jr. arranged a private placement of 2.5 million shares to three accredited victim-investors for gross cash proceeds of $2.5 million. The funds were transferred into Hometown's checking account, to which Patten had access. Following the private placement, Coker, Jr. received $25,000 per month of victim funds in bogus consulting fees through VCH Limited, a Macao-based shell corporation he controlled, totaling $250,000 in victim funds over the course of the scheme.

After negative news articles were published about Hometown in May 2020, and after Individual-1 and Individual-2 raised significant concerns about the negative news, they were removed as officers of the company, and Coker Jr. took the reins as chief executive officer of the publicly listed company.

As a result of his conduct, on September 26, 2022, the Defendant was charged by Indictment with conspiracy to commit securities fraud, in violation of Title 18,

United States Code, Section 371 (Count One); securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2 (Count Two); and conspiracy to manipulate securities, contrary to Title 15, United States Code, Sections 78i(a)(2) and 78ff, and Title 18, United States Code, Section 2, in violation of Title 18, United States Code, Section 371 (Count Three).

At the request of the United States, on or about January 11, 2023, Coker Jr. was arrested on a provisional arrest warrant in Phuket, Thailand, pending extradition to the United States. On March 15, 2023, the Defendant was returned to the United States, in law enforcement custody. The same day, the Defendant appeared before the Honorable Michael A. Hammer, United States Magistrate Judge, for an initial appearance and arraignment, at which time he consented to detention pending submission of a bail package. A bail review hearing, which was scheduled to proceed before the Honorable Edward S. Kiel, United States Magistrate Judge, on March 23, 2023, was adjourned because U.S. Pretrial Services reported that Immigration and Customs Enforcement ("ICE") had lodged a detainer, which remains in effect. On March 29, 2023, the Honorable Cathy L. Waldor, United States Magistrate Judge, held a bail hearing to consider the Defendant's motion for release. Judge Waldor set conditions and ordered that Coker Jr. be released pending trial. At the Government's request, Judge Waldor stayed the release order pending appeal. On April 3, 2023, the Government filed a motion in this Court extending the previously granted stay. The same day, the Government also filed a motion requesting that this Court revoke Judge Waldor's release order. On April 17, 2023, after considering oral argument on the appeal motion, this Court revoked Judge Waldor's order of release and ordered that Coker, Jr. be detained. On August 18, 2023, Coker, Jr. filed the motion now before the Court, moving for the Court to reconsider its April 17, 2023 ruling.

## The Bail Reform Act

The Bail Reform Act establishes that the Court "shall order the pretrial release" of a defendant "unless the judicial officer determines that such release will not reasonably assure the appearance" of the defendant or "will endanger the safety of any other person or the community." 18 U.S.C. § 3142(b). Section 3142(g), in turn, provides several factors that this Court must consider in making that determination, including "the nature and circumstances of the offense charged" and "the history and characteristics" of the defendant. In cases such as this where the Court has already ruled on a motion for release, § 3142(f)(2) establishes that "the hearing may be reopened . . . at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably

assure the appearance of the person as required and the safety of any other person and the community."

While Coker, Jr. argues that new information exists for the Court to consider, the Motion is really an effort to get a second bite at the apple. There is no new information that was "not known to the movant at the time of the hearing." 18 U.S.C. § 3142(b). Nor does any of the information presented have a material bearing on the Court's prior analysis. Simply stated, the Motion is an attempt to strengthen a bail package by offering additional conditions after the Court has already ruled that there are *no conditions* that can reasonably assure the Defendant's appearance. Therefore, denial of the Defendant's motion under § 3142(f) is appropriate. Setting aside this threshold issue, the package is insufficient on the merits.

In sum, Your Honor should find—for the reasons already set forth on the record during the initial detention hearing—that there is no condition or combination of conditions that could ensure the Defendant's appearance at future proceedings.

## Argument

Coker, Jr.'s proposed bail package fails to sufficiently address his significant flight risk, which the facts demonstrate by a preponderance of the evidence. While the Government acknowledges that he now presents a somewhat stricter package, the Defendant does not present any new information not known to him at the time of the Court's ruling to detain him.

### RENUNCIATION OF CITIZENSHIP

As previously briefed and argued on the record, the Defendant renounced his United States citizenship in June 2019—*while actively engaged in the market manipulation scheme charged in this Indictment*. While the Government does not assert that his renunciation was in response to the charges he now faces, the timing of his renunciation is notable.[1] His Motion lays out his history in the United States, his positive childhood, and his continued family ties to the United States. He nonetheless chose to renounce his citizenship. Indeed, in a statement on the renunciation forms that he completed at the U.S. Consulate in Hong Kong, the Defendant <u>voluntarily</u> stated:

> While I was born and raised in the U.S., I moved to Hong Kong in July, 1992 for career reasons and have established

---

[1] Also notable, when pandemic-related travel restrictions lifted, which was during the pendency of the charged scheme, the Defendant did not travel to the United States. Instead, his parents travelled to him in Thailand.

4

> my roots and extensive social and family ties here. I have no intention to return to live or work in the U.S., and have therefore decided to renounce my U.S. nationality.

But now Coker, Jr. asks this Court to disregard his renunciation when weighing his flight risk. Of course, it has direct bearing on his serious risk of flight. The Defendant has resided outside the United States for at least the past thirty years. By his own account, as set forth in the Motion, as the Defendant's "professional life flourished, his roots in Asia, particularly Hong Kong deepened." Motion at 9. Coker, Jr. has significant personal and professional national ties, including in China and Hong Kong, with which the United States does not have an active extradition treaty.[2] The Government acknowledges that the Defendant has family in the United States and appreciates the Defendant's proffer that he remains close to his family—but he nonetheless renounced citizenship and has worked, resided, and "flourished" abroad for the past thirty years.

Coker, Jr. posits that the Court weigh the fact that he is a St. Kitt's citizen—given the island's relative proximity to his family in the United States—in favor of release. While the Government will not speculate about Coker, Jr.'s motive for becoming a citizen, it is important to note that he has never lived in St. Kitts, where he visited once 25 years ago. Tr. at 15:9. St. Kitts, which notably allows dual citizenship, has a long-running Citizenship-by-Investment program.[3] To become a citizen, an individual must make a significant financial investment (generally $150,000). St. Kitts' citizens are not taxed—there is no income, inheritance, or wealth tax. And while the Government appreciates that the Defendant would be willing to execute an irrevocable waiver of extradition from St. Kitts as part of his release conditions, the fact remains that he has not spent time in St. Kitts, but instead, has spent considerable time in Hong Kong and China—two non-extraditable countries.

---

[2] Counsel for the Defendant acknowledged the lack of extradition from Hong Kong on the record. Tr. at 9:15-17. He also acknowledged that before spending approximately one and a half years in Thailand, Coker, Jr. spent a majority of his time in Hong Kong for the last 20-25 years. He has also lived in Macao, China, and Singapore. Tr. at 15:12-14; 19:16-22.

Of note, Coker, Jr. at least previously had permanent resident status in Hong Kong. Motion at 15. It is not known whether he still enjoys this status.

[3] https://www.gov.kn/apply-for-a-passport/ (last visited August 23, 2023).

## THE DEFENDANT'S ASSETS

Coker, Jr.'s assets, as known to the Government and this Court, are based on self-reporting. Because of limited diplomatic relations, the Government does not have visibility into Mr. Coker's assets in China, Macao, and Hong Kong. Of course, at this stage, a proffer is admissible for purposes of consideration of bail or detention. It is nonetheless important to highlight that the Defendant engaged in a long-term, complex fraud scheme that relied upon shell corporations, straw stockholders, false filings, and manipulative stock trading to create an illusion of corporate entities with genuine market interest; without this, the fraud could not succeed. The Defendant's foreign business acumen and network, which he has cultivated while living outside of the United States for more than 30 years, were critical to the fraud scheme. The Defendant, through his shell corporations, took control of a majority of the stock and masked his ownership interest in Hometown and E-Waste in order to give the false impression of an arms-length relationship, when in reality, he and his co-conspirators controlled every aspect of these corporations. And despite the fact that Coker, Jr.'s shell companies, located in Macao, held 2.7 million Hometown shares, the Defendant and his co-conspirators filed a fraudulent S-1 Form with the Securities and Exchange Commission ("SEC") certifying that "none of the selling shareholders nor any of their respective affiliates had any material relationship with us or any of our predecessors or affiliates." The Defendant, who told Pre-Trial Services he has been unemployed since 2021 and has not earned income since that time, also maintains corporate bank accounts holding millions of dollars in the United States for undisclosed business entities.[4] In short, the Government doubts that Coker, Jr.'s self-reported assets encompass the entirety of his foreign assets. Simply stated, the Defendant has reported *certain* assets, but given his business acumen, significant foreign ties, and 30-year residence outside the United States, there is no evidence to support that he

---

[4] Coker, Jr. disclosed to Pre-Trial Services he had approximately $2,000,000 in Wells Fargo corporate bank accounts held by business entities he owns. In his Motion, counsel "confirmed that approximately $550,000 was dispersed [sic] from the Wells Fargo accounts prior to Mr. Coker, Jr.'s initial appearance . . . and that the vast majority of those funds were used to pay for filing and professional fees incurred by Hometown international as well as legal fees related to this matter." Motion at 5. It is not clear how long before his initial appearance these funds were disseminated (and whether they were disseminated after the Indictment was filed). Based on its investigation, the Government does not believe that Coker, Jr. is a signatory to the business accounts for Hometown, E-Waste, Tryon, Benchmark, or Europa Capital. Coker, Jr. does not identify the business entities he owns for which he maintains corporate accounts in the United States, nor does he provide proof of how the $500,000 was spent. He claims to be unemployed since 2021. Moreover, it is noteworthy that Coker, Jr. stated in his renunciation paperwork that he had no intention to ever return to the United States to live or work, *see* p.4, supra, but yet now claims that he maintains business accounts for unknown business entities in the United States. These discrepancies cast further doubt on the completeness of Coker, Jr.'s financial disclosures.

has reported *all* of his assets. The ease with which the Defendant has accessed and transferred $3,000,000 over the past four months is alarming.

With respect to the financial conditions proposed, even if the Court accepts as true that the nearly $3,000,000 cash is the entirety of Coker, Jr.'s assets, he still owns property in Panama and "possible assets" in St. Kitts (Pre-Trial Services Report dated March 23, 2023).

### THE DEFENDANT KNEW OF THE INDICTMENT AND MADE NO EFFORT TO ASSIST IN HIS APPREHENSION

As previously argued, the Defendant did not voluntarily board a flight to answer these charges—he returned to the United States in the custody of federal agents. In his Motion, the Defendant offers his apology but submits that he did not voluntarily return to the United States because of his medical issues ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[5] Motion at Ex. B. But this is nothing new; counsel made this same argument before your Honor in April 2023, and your Honor rejected it. Tr. at 10:25-1-12-7. As Your Honor stated:

> [I]f your client had issues that precluded him from traveling, medical or otherwise, he knew he had been indicted, he sat there for four months, October, November, December, almost four months, three and a half to four months, why did he not contact the government and say, I understand I have been indicted, I have these issues, I can't travel. I want to surrender, I want to have my initial appearance but I can't do it. I don't understand that, particularly in a case where his father is a codefendant [. . . ] [T]o stand here and say he didn't hide, he didn't use an alias, he just kind of sat there and waited,

---

[5] When interviewed by U.S. Pretrial Services, the Defendant reported no history of alcohol abuse and stated that he was in "good physical health with no medical problems reported." Pretrial Services Report, dated March 23, 2023. The Defendant's denial of alcohol abuse, a factor that would have rightfully been considered within the Assessment of Non-Appearance (see 18 U.S.C. § 3142(g)(3)(A), stating that, among other factors, a Court considering a release package should consider "the person's . . . physical and mental condition . . . [and] history relating to drug or alcohol abuse") is concerning with respect to the Defendant's candor, given the Defendant's recent disclosure of significant health concerns related to his use of alcohol. Given the severity of the health symptoms to which the Defendant now attributes his failure to return to the United States, it strains credulity to think his failure to disclose a history of alcoholism was merely an inadvertent omission or an oversight. The Defendant's lack of candor with Pretrial Services, an arm of the Court, presents very real concerns, particularly now that the Defendant asks this Court to accept—on nothing more than his word— that he has disclosed and surrendered all of his foreign assets.

7

>does not suggest the opposite, which is that he won't flee, in my mind, and, in fact, causes the question of, why then -- because when I read the transcript you kept saying, he wants to answer these charges, he wants to defend himself – why did he not do something?

Tr. at 12:9-13:1.

Moreover, and as previously noted, law enforcement received credible information indicating that after he learned of the charges, the Defendant actively attempted to determine the type of warrants that were in place. Perhaps the Defendant's decision to remain in Thailand was motivated by concerns of being arrested at the border. It is not the Government's place to opine on the severity of the Defendant's medical condition. We are confident, however, that had the Defendant reached out to the Government, arrangements could have been made to ensure his safety while also answering these charges. The Defendant's claims to the contrary are sheer speculation and conjecture. Those arrangements could only be made if Coker, Jr. initiated contact. The fact remains that Coker, Jr. knew about the charges against him, see Tr. at 9:3-12, and chose to make zero effort to "surrender, communicate with the government or in any way contact the government." Tr. at 37:24-25. This fact militates in favor of continued detention, not release.

### COKER, JR.'S POTENTIAL GUIDELINES EXPOSURE

As a threshold matter, the Government agrees with the Court that calculating Coker, Jr.'s Guidelines exposure is premature and should not be considered at this stage. Tr. at 8:3-5.

Even if the Court were to consider this factor, it does not weigh in favor of release. While Coker, Jr.'s Guidelines calculations will be appropriately calculated at the time of his sentencing, the Defendant's calculations set forth in support of his motion fail to capture the full picture of the offense conduct. To begin, as noted above and in earlier briefing, in or around mid-April 2020, the Defendant and his co-conspirators secured a total $2.5 million private placement of Hometown shares from three investors. Almost immediately, the Defendant and his co-conspirators began paying themselves with these victim funds through "consulting fees." As previously noted, the entire $2.5 million could rightfully be considered loss, which results in a 16-level enhancement under U.S.S.G. 2B1.1(b)(1)(I).[6]

This enhancement, when coupled with a base offense level of 7, under U.S.S.G. § 2B1.1(a)(1), a 2-level enhancement because of the offense's sophisticated means

---

[6] This loss figure is greater than the $1,000,000 the Defendant proposes in support of his bail.

under U.S.S.G. § 2B1.1(b)(10), and a 4-level enhancement because the Defendant was an officer or director of a publicly traded company at the time of the offense, would result in an offense level of 29, which results in a Guidelines range of 87-108 months' incarceration.[7] Coker, Jr. has been detained approximately 7 months.

### CONCERNS ABOUT REVIEWING DISCOVERY MATERIAL

The Government understands and appreciates the Defendant's right to participate in his defense, including by reviewing discovery. That right, however, is not absolute.

In arguing that Coker, Jr.'s pretrial detention presents "due process concerns," counsel cites *Sistrunck v. Lyons*, 646 F.2d 64, 69 (3d Cir. 1981) for the proposition that pretrial detainees are "handicapped in consulting counsel, searching for evidence and witnesses, and preparing a defense." Def. Br. 16. But this quote, as the *Sistrunck* Court specifically noted, only represents one side of the analysis.

> The values represented and protected by bail must be measured against the social costs and the difficulties of administering a bail system. The answer is not unequivocal. On the one hand, admission to bail enhances the adversary system by permitting an untrammeled preparation of the defense. As the Supreme Court has observed, 'without this conditional privilege, even those wrongly accused are punished by a period of imprisonment while awaiting trial and are handicapped in consulting counsel, searching for evidence and witnesses, and preparing a defense.' *On the other hand, if bail is not effective in preventing flight, the adversary system is harmed by the defendant's failure to appear at trial*.

*Id.* (emphasis added) (internal citations omitted). As outlined above, this Court has already found that this Defendant represents a serious flight risk. Tr. at at 37:3-6.

In an effort to address the Defendant's concerns, the Government contacted the United States Marshals Service to inquire whether Coker, Jr. could receive additional time to access discovery materials. On August 23, 2023, the Government was informed by the United States Marshals that the Defendant is already afforded an additional two hours *per day* (not per week) to review discovery.

---

[7] The Government's loss analysis is ongoing. The Government is aware of additional victim investors and additional potential losses. The Government may argue in support of additional enhancements, such as the 2-level enhancement for 10 or more victims, at the time of sentencing if appropriate.

      The Government agrees, as noted on multiple occasions, that this is a complex case involving voluminous discovery. The Government has gone to great lengths to produce discovery to the defense in a timely, efficient manner. But there are several factors that should be considered here. First, the Defendant has retained two skilled criminal trial attorneys who have unfettered access to the full discovery that has been provided to them. Second, the Defendant has entered into three separate continuance agreements with the Government, primarily to review discovery. The Government is not opposed to entering into additional continuance orders, as they become necessary. And third, the Defendant has been given a *significant amount of additional time* to review his discovery by the facility where he is housed. There has been no due process violation, and the voluminous/electronic nature of the discovery in this case does not necessitate the Defendant's release.

## Conclusion

      For the foregoing reasons, and those outlined in the Government's April 3, 2023 and April 13, 2023 submissions, the Government respectfully submits that the Court should deny Coker Jr.'s Motion for Reconsideration of the Court's Order of Detention.

      Respectfully submitted,

      PHILIP R. SELLINGER
      United States Attorney

      By: LAUREN E. REPOLE
      SHAWN P. BARNES
      Assistant U.S. Attorneys

cc:    JOHN A. AZZARELLO, Esq., via ECF
        WILLIAM F. MCGOVERN Esq., via ECF